AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

E-FILED
Wednesday, 01 April, 2020  04:34:28 PM
Clerk, U.S. District Court, ILCD



# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| In the Matter of the Search of | | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | |
| | ) | Case No. 20-MJ-7058 |
| 103 Dropseed Dr., Savoy, Illinois, 61874, more particularly described on Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

103 Dropseed Dr., Savoy, Illinois, 61874, more particularly described in Attachment A, that is attached hereto and incorporated herein by specific reference,

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2251 | Sexual Exploitation of a Minor |
| 18 U.S.C. 2252 & 2252A | Trafficking Child Pornography |

The application is based on these facts:

See Affidavit of Champaign County Sheriff Investigator Dwayne Roelfs

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
s/Elly M. Peirson
*Applicant's signature*

Elly M. Peirson, Assistant U.S. Attorney
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____electronic mail and telephone_____ *(specify reliable electronic means).*

Date: _____04/01/2020_____

s/ERIC I. LONG
_____
*Judge's signature*

City and state: _____Monticello, IL_____

Eric I. Long, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Dwayne Roelfs, being duly sworn, depose and state:

1.  I am a Deputy Sheriff, with the Champaign County Sheriff's Office,
assigned to the Criminal Investigations Division. I have been employed as an
Investigator at the Champaign County Sheriff's Office for over twenty years.  As
part of my daily duties as an Investigator, I investigate criminal violations relating
to child exploitation and child pornography including violations pertaining to the
illegal production, distribution, receipt and possession of child pornography, in
violation of state and federal laws, 18 U.S.C. §§ 2251, 2252(a) and 2252A.  I have
received training in the area of child pornography and child exploitation, and have
had the opportunity to observe and review numerous examples of child
pornography (as defined in 18 U.S.C. § 2256) in all forms of media including
computer media.  I have also participated in the execution of numerous search
warrants, many of which involved child exploitation and/or child pornography
offenses.

2.  This Affidavit is made in support of an application for a warrant to search
the following:

> **The Subject Premises**: the residence located at 103 Dropseed Dr., Savoy,
> Illinois, 61874 (hereinafter known as the "SUBJECT PREMISES").  The
> SUBJECT PREMISES to be searched is more particularly described as: a two
> story family residence with green sliding and a taupe colored metal/glass
> storm door, with the numerals 103 vertically posted on the front porch

1

column located to the right of the front door, and a black mailbox with the numerals 103 affixed to the mailbox, with the mailbox being located at the end of the driveway near the street.  The residence has a brown colored asphalt roof.  There is an attached two car garage with taupe colored overhead garage door visible from the front of the residence, further described in Attachment A1. I am requesting authority to search the entire Subject Premises, including the residential dwelling, attached garage, grounds, any vehicles parked upon the property.

3.  I am requesting authority to search the SUBJECT PREMISES for any computer, smartphone and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of the violation of Title 18, United States Code, Sections 2252, 2252A and 2251. As will be shown below, there is probable cause to believe that an individual at the Subject Premises has possessed visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) ("child pornography") in violation of Title 18, United States Code, Sections 2252 and 2252A, and attempted to produce or produced visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) in violation of Title 18, United States Code, 2251.

4.  I am familiar with the information contained in this Affidavit based upon the investigation I have personally conducted and based on my conversations with other law enforcement officers involved in this investigation.

5.   Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2251, 2252 and 2252A are located at the SUBJECT PREMISES and within a computer and related peripherals, and computer media found at the SUBJECT PREMISES. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

6.   The investigation has revealed that an individual assigned the Internet Protocol address ("IP address") 23.123.74.109 on the dates of: January 9, 2020, January 10, 2020, January 15, 2020, January 20, 2020, and January 24, 2020, possessed and distributed child pornography on a computer/digital device that is located at the SUBJECT PREMISES whereby he provided child pornography images through the internet and shared with others through an application based in the United States, referred to herein as "Kik."

### STATUTORY AUTHORITY

7.   As noted above, this investigation concerns alleged violations of the following:

    a.    Title 18, United States Code, Sections 2251(a) and (e) prohibit any person from knowingly employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor

engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

b.      Title 18, United States Code, Sections 2252(a)(1) and (b)(1) prohibit any person from knowingly transporting or shipping, or attempting or conspiring to transport or ship, any visual depiction using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer or mail, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

c.      Title 18, United States Code, Sections 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

d.    Title 18, United States Code, Sections 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

e.    Title 18, United States Code, Sections 2252A(a)(1) and (b)(1) prohibit a person from knowingly mailing, or transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography, as defined in 18 U.S.C. § 2256(8), or attempting or conspiring to do so.

f.    Title 18, United States Code, Sections 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

g.    Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign

5

commerce or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## **DEFINITIONS**

8.  The following definitions apply to this Affidavit and Attachment B:

    a.  "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

    b.  "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room.

    c.  "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

    d.  "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image of picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor

engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

e.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. See 18 U.S.C. § 1030(e)(1).

f.    "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or

7

"booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h.      "Hashtag," as used herein, refers to a word or phrase preceded by a hash or pound sign (#), which is used to identify messages or groups on a specific topic.

i.       "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers (ISPs) control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

j.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

k.      The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

m.      "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

n.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

o.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

p.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

q.      A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

r.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

**Background on Kik**

9.  Kik is a freeware instant messaging mobile app presently based in the United States. Kik is a smartphone messenger application that lets users connect with their friends and the world around them through chat. Users can send text, pictures, videos and more – all with the app.

10. Kik is available for download through the iOS App Store and the Google Play store on most iOS (iPhone, iPod, iPad), Android (including Kindle Fire) and Windows 7 devices.  Kik is free to download and uses an existing Wi-Fi connection or data plan to send and receive messages, photos, videos, sketches, mobile webpages, and other content after users register a username.  Kik is known for its features preserving users' anonymity, such as allowing users to register without providing a telephone number. However, the Kik application logs user IP addresses, which the company can use to determine location. As of May 2016, Kik Messenger had approximately 300 million registered users, and was used by approximately 40% of United States teenagers.

11. A main attraction of Kik that differentiates it from other messaging apps is its anonymity. To register for the Kik service, a user must enter a first and last name, e-mail address, and birth date (which, as of February 2016, must show that the user is at least 13 years old), and select a username. The Kik registration process does not request or require the entry of a phone number (although the user has the option to enter one), unlike some other messaging services that require a user to provide a functioning mobile phone number.

12. In March 2015, the company adopted a more aggressive strategy by utilizing Microsoft's PhotoDNA cloud service to automatically detect, delete, and report the distribution of child exploitation images on its app.

13. In October of 2019, Kik Messenger announced they had been purchased by MediaLab, a company located in the United States.

### Details of Investigation

14. On March 20, 2020, Investigator Roelfs received a CyberTip referral regarding the possession and distribution of child pornography. CyberTips are routinely distributed from the Illinois Attorney General's Office, Internet Crimes Against Children (ICAC) division. In this CyberTip the ICAC referral originated with the National Center for Missing and Exploited Children (NCMEC). MediaLab/Kik self-reported to NCMEC that one of their online social media users was possessing content believed to be images and movies of child pornography. MediaLab/Kik reported that their user, identified as "rdonut63," shared some of the illegal content in a "private chat message" and the user shared other content in a "messaging group," consisting of multiple MediaLab/Kik users. On five different dates/online sessions between January 9, 2020, 1606 hrs (CST) and January 24, 2020, 1157 hrs (CST) a total of 15 digital files of suspected child pornography were uploaded by the suspect account, "rdonut63." Seven of the suspect files were sent from the suspect's account to other users via, "private chat message." Eight of the suspect files were sent from the suspect's account to other users in special "messaging groups." For one of the files, MediaLab/Kik did not

notate if it had been sent from the suspect's account to other users via "private chat message" or "messaging groups." .

15. When each suspected digital file of child pornography was shared, the user, "rdonut63," utilized the same IP address (23.123.74.109), an IP address controlled by AT&T and geo-located to Savoy, Illinois, at the SUBJECT PREMISES. I have viewed the suspected child pornography images and videos that were submitted to NCMEC for the user "rdonut63" and based on my training and experience, I believe the following to contain child pornography, as that term is defined by federal law.

    a.    "bec6b35a-79f0-4312-b25b-01b3a1654f88.mp4" is a movie that is twenty eight (28) seconds in length. The movie contains a prepubescent minor Asian female with black hair approximately 8-11 years of age. The female appears to be sitting and she appears to be holding the recording device with her left hand while she touches her vagina with her right hand. The female is wearing a Mickey Mouse type pajama top and does not appear to be wearing any pants or underwear. On 01/11/2020 at 01:07:46 (UTC) this file was sent from the suspect to other users in a "messaging group".

    b.    "dfd3cdcb-d72e-4b12-b3a9-f2542485f0ed.mp4" is a movie that is fifteen (15) seconds in length. The movie contains a prepubescent minor Asian female with black hair approximately 6-9 years of age. The female is wearing a coat and appears to be sitting in front of a bookshelf filled with books while looking towards the camera that is recording her. As the movie plays the camera view moves away from the female's face and down towards her vagina. The female is not wearing pants or underwear and her vagina is exposed to the camera. The female uses her right hand and places her fingers on and inside her vagina. On 01/11/2020 at 0125 hrs (UTC) this file was sent by the suspect to other users in a "messaging group".

c.   "5f475dc6-226f-4e0d-a9ec-9be9bb0e258f.mp4" is a movie that is thirty-eight (38) seconds in length. The movie contains a prepubescent minor Asian female with black hair approximately 8-11 years of age. The female is naked and positioned lying on her back with her arms stretched up and behind her head. As the movie plays the focal point changes. The camera moves down from the head of the female to the female's vagina where an adult white male's penis can be seen penetrating the female's vagina.  On 01/11/2020 at 0156 hrs (UTC) this file was sent by the suspect to other users in a "messaging group".

d.   "3d064045-4982-453d-9e07-141311f368f0.mp4" is a movie that is one minute and twelve seconds (1:12) in length. The movie begins by showing three naked bodies, two white females and an adult white male. The adult male is positioned standing behind one female's buttocks with his penis inserted into that female's anus. The second white female is shown lying on her back positioned on top of the first white female's back. The second white female's vagina is fully exposed, and the camera's focal point is fixated on this female's vagina, the buttocks of the first female, and the adult male's penis that is penetrating the anus of the first female. There is a moment during this movie when the second female's face is partially visible. The faces of the first female and adult male are not visible. The age estimate of the first female is not possible because most of her body is covered by the second female that is lying on her back. The age of the second female appears to be approximately 6-9 years of age. Additionally, the left hand of the adult male is visible, and the male's thumb is rubbing the second female's vagina and also inserted into the second female's vagina. On 01/15/2020 at 2221 hrs (UTC) this file was sent by the suspect to other users in a "messaging group".

e.   "1f96a0b5-8123-4ff3-9221-c31724f72480.jpg" is an image of a minor white female with brown hair approximately 11-13 years of age.  The female appears to be seated naked from the waist up. The image is a close-up image of the female showing her from the waist up to her eyebrows. The female appears to have a pink colored pair of pants

13

or shorts on. The female's bare breasts are exposed showing some indication of breast development. On 01/20/2020 at 1434 hrs (UTC) this file was sent by the suspect to other users in a "messaging group."

f.      "4385adbb-2745-4b70-a768-58805a4c9696.mp4" is a movie that is two minutes (2:00) in length. The movie contains a minor white female with blonde hair and being approximately 12-15 years of age. There is audio with this movie and the movie begins by the female talking to the camera/recording device stating her name was "Leslie" and saying that she was 12 years old and that it was her first time "masturbating". The female is in a bathroom and can be seen standing up and backing away from the camera. The female removes her shirt followed by removing her blue colored bra. During the movie voices in the background can be heard conversing along with the sound of a baby's cries. The female rubs her hands over her naked body including her bare breasts, buttocks, and vaginal areas. The female eventually sits on the bathroom floor and spreads her legs while rubbing her right hand and fingers on her vagina. The female has a large amount of pubic hair present. On 01/20/2020 at approximately 1436 hrs this file was sent by the suspect to other users in a "messaging group".

g.      "5e0073dc-176f-4535-848b-58db8bea4f5d.mp4" is a movie that is fifteen seconds (15) in length. The movie contains a prepubescent minor white female with brown hair and being approximately 6-9 years of age. There is audio present in this movie, however, the noises present do not appear to be from human voices. The female appears to be standing in a bathroom and is positioned towards the camera. The female is naked and begins by walking towards the camera and then kneeling on the floor directly in front of the camera. The female begins rubbing her bare under developed breasts followed by using both her hands to frame her vaginal area for the camera. The female then stands up turning around and squatting her buttocks down to the floor. The female then places her hands on the floor positioning herself on her hands and knees with her anus and vagina exposed to the camera. The female shakes her bottom while

in this position. On 01/24/2020 at 1751 hrs (UTC) this file was sent by the suspect to another user via a "private chat message".

h.  "93d31804-511a-4544-9f2f-a899249b455e.mp4" is a movie that is one minute and eight seconds (1:08) in length. The movie contains a minor white female with brown hair and being approximately 12-15 years of age. There is audio present during this movie, however, only background noise is heard with no words or voices being discernable. The movie begins with the female using her left hand rubbing her vagina and inserting fingers into her vagina. The female then stands up turning around placing her buttocks towards the camera. The female rubs her buttocks and spreads them apart to show her anus and vagina to the camera. The female then turns back around towards the camera lifting her shirt showing and rubbing her bare breast. On 01/24/2020 at 1753 hrs (UTC) this file was sent by the suspect to another user via a "private chat message".

i.  "3beoff78-288e-4949-a775-66aa1d2d55d2.mp4" is a movie that is one minute and twenty-two seconds (1:22) in length. The movie contains a prepubescent minor Asian female with black hair and that is approximately 6-9 years of age. There is no audio present during this movie. The movie begins with the female exposing her under developed breasts seated in front of a camera device. The female then pulls her top up from her torso placing the shoulder straps over her shoulders. At approximately thirty-four seconds (34) into the movie, an adult white male who is not wearing pants and has an erect penis approaches the side of the female. The female can be seen holding the male's penis as the male places his penis into the female's mouth. The male removes his penis from the female's mouth, masturbates himself and ejaculates onto the female's chest. On 01/24/2020 at 1754 hrs (UTC) this file was sent by the suspect to another user via a "private chat message".

j.  "caca73d7-1573-4784-8fd4-6211093eaa6c9.mp4" is a movie that is one minute and forty-five seconds (1:45) in length. The movie consists of a minor white female with blonde hair and that is approximately 10-12 years of age. There is audio noise present

during the movie, but no voices are heard. The movie begins with the female sitting on the edge of a bed. The female is wearing a white colored sports type bra and no underwear clothing from the waist down. The camera moves to focusing on the female's vagina as she sits on the bed. The female then changes position by turning over and kneeling on the bed placing her buttocks facing the camera. On 01/24/2020 at 1757 hrs (UTC) this file was sent by the suspect to another user via "private chat message".

16. Investigator Roelfs determined that the IP address 23.123.74.109 was assigned to the Internet Service Provider:  AT&T, headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, FL.  On March 23, 2020, your affiant sent a State of Illinois Subpoena Duces Tecum to AT&T for the IP records maintained by AT&T, who holds the registration on the IP address 23.123.74.109, requesting subscriber information for the user of that IP address on the date and time that the suspect files were transferred/distributed on Kik, between January 9, 2020, 22:06:42 (UTC) and February 5, 2020 02:48:27 (UTC), as detailed above.

17. On March 24, 2020, AT&T provided the results from the Subpoena Duces Tecum.  The results stated that IP address 23.123.74.109, was assigned to subscriber Susan Mynatt at 103 Dropseed Dr., Savoy, IL, 61874-8545, in the Central District of Illinois.  AT&T further provided an associated phone number for this subscriber account (#132247044) as 217-355-9760,  and noted that the account was currently "active."

18. Your affiant knows that Internet service provided by AT&T U-Verse must be wired directly to the address of service and cannot be used remotely.  Your affiant contacted AT&T and inquired when Susan Mynatt's account was activated.

16


AT&T stated that service was established and activated on 12/19/2013 and the account for service at 103 Dropseed Dr., Savoy, IL 61874-8545 is currently active as of the date of the return (March 24, 2020).

19. On March 25, 2020, your affiant checked the Illinois Secretary of State database and learned that Susan L. Mynatt, a female born in September 1973, was issued an Illinois Driver's License M530-7927-3860, and the address listed on her driver's license was 103 Dropseed Dr., Savoy, Illinois, 61874.

20. Your affiant checked Susan L. Mynatt's local police contacts, databases, social media, and criminal history. Susan Mynatt had no record on file when her criminal history was checked. The local police contacts for Susan were contacts for minor traffic offenses. A law enforcement database check revealed that Susan Mynatt currently resides at 103 Dropseed Dr., Savoy, Illinois and that she has reportedly lived at this address since February 2, 2010. The database check also revealed that Douglas O. Mynatt shared this same address with Susan Mynatt. An online social media check revealed a Facebook profile for Susan Mynatt and in her Facebook timeline history, your affiant learned that she was married to Douglas O. Mynatt on June 15, 2002. Additionally, further review of Susan Mynatt's Facebook timeline revealed that she and Douglas Mynatt appeared to have a son (unknown name) and the son's age approximately 11-14 years old.

21. On March 25, 2020, your affiant checked the Illinois Secretary of State database and learned that Douglas O. Mynatt, is a white male born in August, 1963, and was issued an Illinois Driver's License M530-1746-3225, with the address

listed on his driver's license as 103 Dropseed Dr., Savoy, Illinois, 61874, the SUBJECT PREMISES. Additionally, records revealed that Douglas O. Mynatt had a 2018 Chevrolet Pickup registered in his name with Illinois license tag number, "89VOLS-B."

22. Your affiant checked Douglas O. Mynatt's local police contacts, databases, social media, and criminal history. Douglas had no record on file when his criminal history was checked. The local police contacts for Douglas were contacts for minor traffic violations. The most recent law enforcement contact was dated, 05/19/00, when Douglas's then 1997 Chevrolet S-10 truck bearing Illinois registration, "89VOLS-B", was towed. The database check revealed that Douglas currently resides at 103 Dropseed Dr., Savoy, Illinois and that he has reportedly lived at this address since March 2010.. The database check also revealed that Mynatt was possibly employed by "University Laboratory High School" located at 1212 W. Springfield Ave., Urbana, Illinois (located on campus at the University of Illinois). The online social media check revealed a Facebook profile for Mynatt and a check of his timeline revealed that Mynatt updated his profile picture and cover photo in November 2019. The picture and photo updates showed Mynatt posing with high school aged female cross-country runners. Additional photos on Douglas's Facebook timeline showed him posing with his presumed son with the two standing in front a "University of Illinois – University High School – 1212 W Springfield Avenue" sign.

23. On March 26, 2020, your affiant traveled to 103 Dropseed Dr., Savoy, Illinois 61874, to observe and photograph the residence. Additionally, your affiant used his work cell phone to scan the immediate vicinity of the residence for available wireless Wi-Fi networks. Your affiant detected a total of fifteen different wireless Wi-Fi networks and noted that all these available networks were secured networks requiring a password to join.

24. On March 27, 2020, your affiant prepared a preservation request addressed to Kik requesting Kik to preserve, from January 1, 2020 – March 27, 2020, user "rdonut63" full subscriber data, full content user data, full content group data, and full content ID data.

25. On March 27, 2020, your affiant received notification from Taylor Burd, National Center for Missing and Exploited Children (NCMEC) analyst 1, Child Victim Identification Program, that one of the movie files, "3beoff78-288e-4949-a775-66aa1d2d55d2.mp4", that suspect user, "rdonut63," shared with other users on the Kik social media platform contained a victim child that has been identified from a previous investigation conducted by the Federal Bureau of Investigation. The description of this movie file can be located above in this affidavit under paragraph 15, subparagraph (i). Your affiant noted from the Child Identification Report, TA#132063, that this movie file was from the series "At School.".

26. On March 31, 2020, your affiant checked the address of 103 Dropseed Dr., Savoy, Illinois using the online Champaign County Property Tax Inquiry website.

This check listed the property owners of this address as being Douglas O & Susan L Mynatt.

27. Included within the cybertip from MediaLab/Kik were additional IP addresses for logins by the user "rdonut63" on various dates and times.  Your affiant determined, through publically available database checks that an IP address frequently used by "rdonut63," 130.126.255.137, resolved to the University of Illinois, in Champaign/Urbana. On March 27, 2020, a U.S. Department of Justice administrative subpoena was served on the University of Illinois to determine the user assigned to this IP address on the dates and times requested in the subpoena.  Due to the COVID-19 public health emergency, the University of Illinois indicated that there may be a delay in responding to the government's request. As of the writing of this affidavit, a response has not been received.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

28. I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

    a. Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.   Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.   A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

    f.      Individuals also use online resources to retrieve and store child pornography.  Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats.  A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases.

    g.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files).  Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

29. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30. I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

> d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

31. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

> a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

> b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

c.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

d.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log:  computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

e.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For

25

example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

f.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

g.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

h.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

i.      I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and

experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used, data that was sent or received, notes as to how the criminal conduct was achieved, records of Internet discussions about the crime, and other records that indicate the nature of the offense.

32. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage

devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

33. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are

instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

34. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICES

35. This warrant permits law enforcement to compel **Douglas O. Mynatt** and **Susan L. Mynatt** (but not any other individuals present at the premises at the time of execution of the warrant) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometic access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

36. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

37. As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

38. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

39. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one

of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Douglas O. Mynatt and Susan L. Mynatt to the fingerprint scanner of the devices found at the premises; (2) hold the devices found at the premises in front of the face of Douglas O. Mynatt and Susan L. Mynatt and activate the facial recognition feature; and/or (3) hold the devices found at the premises in front of the face of Douglas O. Mynatt and Susan L. Mynatt and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that Douglas O. Mynatt and Susan L. Mynatt state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask Douglas O. Mynatt and Susan L. Mynatt to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## REQUEST TO SEAL

40. It is further requested that this Affidavit be sealed by the Court until such time as the Court directs otherwise. Given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the target of the investigation at the Subject Premises to the existence of an investigation and likely lead to the destruction and concealment of evidence, and/or flight.

## CONCLUSION

41. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that an individual at the Subject Premises described above is involved in possessing child pornography. I respectfully submit that there is probable cause to believe that an individual in the residence described above, the Subject Premises, therefore has violated Title 18, United States Code, Sections 2251(a), 2252 and 2252A. Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of Title 18, United States Code, Sections 2251(a), 2252 and 2252A, is located in the residence described above or on the Subject Persons, and this evidence, listed in Attachment B to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property that is or has been used as the means of committing the foregoing offenses.

42. I therefore respectfully request that the attached warrant be issued authorizing the search of the Subject Premises further described in Attachment A and seizure of the items listed in Attachment B.

Respectfully submitted,

s/Dwayne Roelfs

Dwayne Roelfs, Investigator
Champaign County Sheriff's Office

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by electronic mail and telephone on April 1, 2020. .

s/ERIC I. LONG

Eric I. Long, Magistrate Judge
United States District Court

**ATTACHMENT A**
**DESCRIPTION OF LOCATION TO BE SEARCHED**
**(SUBJECT PREMISES)**

The entire Subject Premises, including the residential dwelling, attached garage, grounds, any vehicles parked upon the property located at 103 Dropseed Dr., Savoy, Illinois 61874. The SUBJECT PREMISES to be searched is more particularly described as: a two story family residence with green sliding and a taupe colored metal/glass storm door, with the numerals 103 vertically posted on the front porch column located to the right of the front door, and a black mailbox with the numerals 103 affixed to the mailbox, with the mailbox being located at the end of the driveway near the street. The residence has a brown colored asphalt roof. There is an attached two car garage with taupe colored overhead garage door visible from the front of the residence. (Photo below of residential dwelling located at subject premises, 103 Dropseed Dr., Savoy, Illinois).



**103 Dropseed Dr., Savoy, Illinois 61874**

# ATTACHMENT B

## *Particular Items to Be Seized*

1.     Computer(s), computer hardware, computer software, removable digital media, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.     Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3.     Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in Title 18, United States Code, Section 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2).

4.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in Title 18, United States Code, Section 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), or child erotica.

5.     Any and all address books, names, and lists of names and addresses of individuals who may have been in communication by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in Title 18, United States Code, Section 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any

means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in Tile 18, United States Code, Section 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

7.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in Title 18, United States Code, Section 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

8.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all visual depictions of minors.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in Title 18, United States Code, Section 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,  as defined in Title 18, United States Code, Section 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

16.     Any and all locked safes or other locked containers that may contain evidence of the commission of criminal offenses, namely, violations of Title 18, United States Code, Sections 2252 and 2252A.

17.     Any and all evidence pertaining to the dates and times of access of the computer or cell phone, the use or knowledge of Facebook Accounts, and internet searches pertaining to the possession or dissemination of child pornography.

18.     Any and all evidence, data or information pertaining to internet history regarding the possession or dissemination of child pornography.

19.     Any and all evidence, data or information pertaining to any e-mail addresses that **Douglas O. Mynatt and Susan L. Mynatt** uses.

20.     Records and information relating to the sexual exploitation of children, including correspondence and communications between users of "Kik";
      a.  Records and information showing access to and/or use of "Kik"; and

    b.  Records and information relating or pertaining to the identity of the person or persons using or associated with "rdonut63".

As used above, the terms "records" and "information" refer to all forms of creation or storage, any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, videotapes, motion pictures, or photocopies).

The term "computer" refers to all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions: desktop computers, notebook computers, mobile phones, tablets, server computers, smart phones, and network hardware.

The term "storage medium" refers to any physical object upon which computer data can be recorded. Examples are hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.

During the execution of the search of the Premises described in Attachment A, law enforcement personnel are also specifically authorized to compel **Douglas O. Mynatt (M/W D.O.B. 08/08/1963) and Susan L. Mynatt (F/W D.O.B. 09/12/1973)** to display any biometric features, including pressing their fingers

(including thumbs) against and/or putting their face before the sensor, or any other security feature requiring biometric recognition, of:

    (a)    any of the devices found at the subject premises, and

    (b)    where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the device's security features in order to search the contents as authorized by this warrant.

This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that **Douglas O. Mynatt and Susan L. Mynatt** state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device.